THE PEOPLE OF THE TERRITORY OF UTAH, RESPONDENT, *v.* RICHARD A. HASBROUCK, APPELLANT.

1. CRIMINAL COMPLAINT. — SUFFICIENCY IN FORM. — REVIEW OF QUESTION FIRST RAISED ON APPEAL.—AGREED STATEMENT OF FACTS.—The sufficiency in form of a criminal complaint will not be considered when raised for the first time on appeal by defendant, who, in the agreed statement of facts, admitted the commission by him of the alleged offenses and agreed on the trial to waive any formal objections, and that the case should be tried on the question of the constitutionality of the statute upon which the prosecution was based and upon the validity of the appointment by the governor of the board clothed with powers under the statute of enforcing it.

2. CONSTITUTIONAL LAW.— ACT TO REGULATE THE PRACTICE OF
MEDICINE.—PRIVILEGES OF CITIZENS.—CONSTITUTIONAL INHIBI-
TIONS.—POLICE POWER OF STATE.—The territorial legislature
passed an act, approved March 10, 1892, entitled, "An act to·
regulate the practice of medicine" (Session Laws 1892, p. 81),
of which section 1 provides for the appointment by the gov--
ernor biennially, with the advice and consent of the council,.
a board of seven medical examiners from various recognized
schools of medicine. Section 2 provides for issuing certificates·
to those who have received degrees from the chartered medical
colleges in good and legal standing and passing a satisfactory
examination. Section 4 provides that graduates of respectable·
medical colleges who are now engaged in practice in the ter--
ritory shall be licensed on presentation of their degree and
proof of their identity without examination, upon the payment
of $5. Section 8 provides that the board may refuse to license
persons guilty of unprofessional or dishonorable conduct, and
may revoke license for like causes. Section 10 provides that
any person practicing medicine in violation of the act shall
be deemed guilty of a misdemeanor. Section 11 provides that
the board shall issue certificates to persons who have practiced.
10 years in the territory on payment of $25, accompanied by
a petition signed by twenty-five legal voters living in the city·
or precinct where the applicant lives, provided such applica--
tion for certificate shall be made within six months. Section
15 provides that "the term respectable medical colleges in
this act shall include colleges in legal standing of any recog--
nized school of medicine." Appellant received a diploma from
a medical college of recognized standing in the year 1882, and
has practiced medicine and surgery ever since, and he prac-
ticed medicine and surgery at Salt Lake City continually from
the 30th day of April to the 6th day of May, 1893, without a.
certificate from the medical board, as provided for in the·
statute. The medical board was appointed and commissioned
by the governor without the advice and consent of the coun-
cil. The act was approved on the last day of the session of
the legislative assembly in the year 1892. The medical board
met, organized and elected proper officers and held regular·
meetings at Salt Lake City between the first Monday in
January and the 30th day of April, 1893, for the examination
of applicants and for issuing certificates as provided for in the·
act. Appellant was convicted before the United States com-

missioner for practicing medicine without a license in viola-
tion of the provisions of this act.    On appeal to the district
court he was adjudged guilty as charged and sentenced to pay
a fine in the sum of $50.    *Held:*    *First.*    That the act is legis-
lation of that general character to protect the community
against the effects of ignorance and incapacity, as well as de-
ception and fraud, in the practice of medicine, and is a legiti-
mate exercise of the police power of the state.    *Second.*    That
the act is not obnoxious to the inhibition of the federal con-
stitution against the deprivation of property without due
process of law.    *Third.*    That the act is not violative of the
constitutional provisions that the citizens of each state shall
be entitled to all the privileges and immunities of citizens in
the several states, and that it does not contravene that part of
the fourteenth amendment which declares that "no state shall
make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States." *Fourth.*    That
appellant is guilty of violating the provisions of the act and
was properly convicted.

3. ID.—ID.—ID.—ID.—An act which provides that graduates of re-
spectable medical colleges, who were at the time of the pass-
age of the act engaged in actual practice of medicine in the
territory, may be licensed without examination, and upon the
payment of a fee of only $5, does not contravene the provis-
ions of the federal constitution that the citizens of each state
shall be entitled to all the privileges and immunities of citi-
zens in the several states, notwithstanding the effect of the
act is to require citizens of any state or other territory who
are likewise graduates of respectable medical colleges, but not
in actual practice in the territory at the time of the passage
of the act, to present their diplomas, make proof of their
identity, submit to an examination, and also to pay a fee of
$25.    Nor does this act contravene that part of the fourteenth
amendment which declares that "no state shall make or en-
force any law which shall abridge the privileges or immuni-
ties of citizens of the United States," by reason of the fact
that persons who have practiced medicine for 10 years con-
tinually in the territory prior to the taking effect of the act
may be licensed to practice upon passing a satisfactory exam-
ination, although without a diploma, while others are required
both to pass an examination and to possess a diploma, because
these provisions are not directed against the citizens of other

states, and do not abridge any of their privileges or immunities, nor withhold from them any privileges or immunities which are not withheld also from citizens of Utah similarly situated.

4. ID.—ID.—ID.—DISPOSITION OF FEES.—PAYMENT OF NECESSARY EXPENSES.—POWERS CONFERRED BY IMPLICATION.—An act to regulate the practice of medicine is not unconstitutional upon the ground that it makes no specific disposition of the fees collected from applicants, since by providing a treasury of the board of medical examiners and an income, the power is conferred by necessary implication to devote the fees to the payment of the necessary expenses.

5. ID.—ID.—ID.—JUDICIAL POWER.—An act to regulate the practice of medicine is not unconstitutional upon the ground that it confers judicial power upon the board of medical examiners, who are authorized by the provisions of the act to ascertain and determine qualifications of applicants to practice medicine.

6. ID.—ID.—ID.—DUE PROCESS OF LAW.—A uniform rule and a uniform process for ascertaining and determining qualifications as prescribed by an act operating equally upon all persons, affording all persons the right to show their qualifications, is due process of law.

7. ID.—ID.—ID.—VALID APPOINTMENT OF MEMBERS OF MEDICAL BOARD.—Appointments of a board of medical examiners are not invalid on the ground that none of them were by or with the advice and consent of the legislative council, as provided by section 1 of the act, which was passed on the last day of the session of the legislature, whose sessions are biennial, since it would have been impossible to have procured such consent at that session, or until the next session held two years later.

8. ID.—ID.—ID.—TIME FOR APPOINTING MEDICAL BOARD DIRECTORY. —The failure of the governor to appoint the members of a medical board within a month after the offices came into existence, as provided by the act, did not invalidate the appointments, the provision as to the time of making such appointments being merely directory.

(No. 467.   Decided March 16, 1895.   39 P. R. 918.)

Appeal from the District Court of the Third Judicial District.   Hon. H. W. Smith, *Judge.*

Richard A. Hasbrouck upon conviction before Harmel
Pratt, U. S. Commissioner, of practicing medicine without
a license, appealed to the district court, and from a judg-
ment of conviction in the district court upon a trial *de.
novo,* appeals. *Affirmed.*

*Mr. J. E. Cochran, Mr. LeGrande Young* and *Mr. J.
H. Murphy,* for appellant.

Appellant does not question the right of the legislature
to pass such laws as will protect the physicians and the
subjects of the territory from the quack and charlatan.
There are plainly marked and well defined limits beyond
which the legislature cannot go.    One of those limits is.
that such laws must be uniform in their application, and
in their requirements.    They must be reasonable and im-
partial.     They must not be arbitrary and capricious.
They must not exclude one class or one of a class for the
benefit of another.    By this law, the estates of men
acquired in professions, estates often the source of great-
est revenue and of highest emolument of honor, estates.
recognized by law as such as well as in bank or railroad.
stock or corner lots, are escheated, forfeited, confiscated
all done without the hearing of court, voice of jury or
aid of any of the processes of court.    No such power to
work ruin exists in a legislature.  Such power is not
within the exercise of legislative will.    It is simply vicious,
arbitrary, absolute tyranny, unwarranted by law and with-
out the sanction of American courts.   Cooley Const. Lim.
(5 ed.) p. 597; 12 Wall. U. S. 419-430.  All taxation
must be uniform and equal; the payment of a license fee
is a tax.  The magnitude of the unequal burden is not
material, if any inequality is permissible it might be made
so unequal as to amount to prohibition to some and abso-
lute permission to others and is not the equality of the
constitution.

Under section 2, the physicians must pay to the board
$25 each; under section 4 $5 each, and under section 11,
$25 each, with no provision of statute for its disburse-
ment or application as fees, or appropriation for use in
which the public have any interest.    The act should read:
"An act to create a medical savings bank, demanding de-
posits and prohibiting disbursements," or "An act creating a
medical monarchy."    They are powerless to appropriate
the money for fees because the legislature does not so
appropriate them.    The legislature has provided for the
pay of the medical board by appropriation of the fees
derived under section 12.    If inadequate, the legislature,
not the courts, must grant relief.    The members may
serve for the compensation provided by statute or resign.
By reason of the legislature restricting the fees of the board
to those derived under section 12, and failing to appropriate
those under sections 3, 4 and 11, to that purpose, they
cannot be a license fee.    They being appropriated to no pub-
lic purpose they cannot be a tax.    If neither license fee
or tax, it must be robbery, plunder, unlawful confiscation.
The legislature not having appropriated the fees to the
board in payment of services, the court cannot so appro-
priate them.    Cooley Const. Lim. (2 ed.) p. 242, 598-9,
602, 611; Dillon Mun. Cor. 291; Hare's Am. Const. Law,
278-281; 27 Ia. 28.    The appointment of the medical
board is absolutely void.    The act was approved March
10, 1892.    The appointment of members of the board was
made by the governor, September 1, 1892, while section 1
provides that the governor shall fill all vacancies within
one month after the time the vacancy shall occur.    Nor
were the appointments made with the advice and consent
of the council.    The governor had no right to appoint
after 30 days, and the appointments not being concurred
in by the council are absolutely void.    Sutherland Stat.
Con. §§ 361-3, 427, 454; Bishop Com. of Stat. § 93;

Bishop Stat. Crimes, § 189. The complaint charges that appellant practiced medicine without license and that is the only charging clause. It only names the crime instead of alleging any acts that constitute it. For these reasons the complaint upon which this conviction is based is clearly insufficient. 1 Bishop Crim. Pro. §§ 505–8, 611; 18 Enc. of Law, 431; *Benton* v. *State*, 32 N. W. 222.

*Mr. J. W. Judd,*     U. S.     Attorney, for respondent.

MERRITT, C. J.:

The defendant in this case was convicted before Harmel Pratt, commissioner, of practicing medicine without a license, in violation of the provisions of the act of the territorial legislature entitled "An act to regulate the practice of medicine," approved March 10, 1892; and was fined $50. On the 29th of May, 1893, an appeal was taken to the Third District Court of Utah territory by the defendant. Thereafter, and on the 25th of January, 1894, the case was heard in the district court before the Honorable H. W. Smith, presiding. A jury was waived and the defendant was tried on the following agreed statement of facts: " That the defendant Richard A. Hasbrouck, upon the 30th day of April, 1893, and from and after said date, continually, to the 6th day of May, 1893, practiced medicine and surgery at Salt Lake City, in Salt Lake county, Utah territory, and has so practiced medicine and surgery in said city and county since prior to the 10th day of March, 1892. That said defendant had received from the Bennett College of Eclectic Medicine and Surgery, in the year 1882, a diploma as a physician and surgeon, and has practiced medicine and surgery ever since receiving the same. That after the passage and approval of the act of the governor and legislative assembly of the

territory of Utah entitled 'An act to regulate the prac-
tice of medicine,' approved March 10, 1892, the governor
of the territory of Utah appointed seven persons as a board
of medical examiners of Utah territory, to execute the
duties in said act prescribed, and issued commissions to each
of said persons as a member of said board. That none of
said appointments were made by or with the advice or
consent of the council of said legislative assembly, and
none of said commissions were issued until after the ad-
journment of said assembly in 1892, and the last on De-
cember 20, 1892. That the day of the approval of said
act, March 10, 1892, was the last day of the session of
said legislative assembly in the year 1892. That the said
seven persons so commissioned as aforesaid met on the
24th day of December, 1892, and organized as the board
of medical examiners of Utah territory, and elected one
of their members, Allen Fowler, M. D., as president of
said board, and Charles C. Schinnick as secretary and
treasurer thereof. That said board held regular meetings
at Salt Lake City, aforesaid, on the first Monday in Jan-
uary, 1893, and on the first Monday in March, 1893, and
numerous other meetings at the same place between the
first Monday in January, 1893, and the 30th day of April,
1893, for the purpose of receiving and considering appli-
cations for license or certificates entitling the holders
thereof to practice medicine and surgery in Utah territory
as provided and contemplated in said act, of which meet-
ings the said defendant had notice. That said defendant has
not at any time made application to said board for any
license or certificate to entitle him to practice medicine or
surgery, as provided and contemplated in said act, and so
practiced medicine and surgery as aforesaid without any
such license or certificate having been issued to him by
said board." The defendant was adjudged guilty as

charged, and sentenced to pay a fine in the sum of $50. From this judgment the defendant appealed to the supreme court.

Upon the question whether the complaint is sufficient in form the authorities are somewhat in conflict; but it is not necessary to pass upon that question, for it is stated by appellant's counsel that any objection to the form of the complaint was waived in the court below, and it was agreed between the prosecution and the defendant that the case should be tried upon the question of the validity of the statute upon which the complaint is founded, and of the validity of the appointment of the board of medical examiners by the governor. The agreed statement of facts, signed by the defendant, admits in so many words that upon the 30th day of April, 1893, and from and after said date, continuously to the 6th day of May, 1893, the time charged in the complaint, at Salt Lake City, in Salt Lake county, Utah territory,—the place charged in the complaint,—he practiced medicine and surgery without any license or certificate from the board of medical examiners. This was an admission of the ultimate fact to be proved by the prosecution, and dispensed with the necessity upon the part of the prosecution of producing evidence of the probative facts, from which the ultimate facts would be adduced, and dispensed also with any further consideration of the formal requisites of the complaint. "That the defendant, at the time and place named, practiced medicine without a license," if it could be held a conclusion, is the defendant's own conclusion, couched in the language of the statute, and set forth in the agreed statement of facts. Under these circumstances, an objection to the sufficiency of the complaint in form, raised for the first time on appeal, will not be considered.

The statute upon which this prosecution is founded is of the same general character as the statutes of a large num-

ber of states upon the same subject,—the regulation of
the practice of medicine. The predominant characteristic
and purpose of such statutes is to prevent the practice of
medicine by incompetent and improper persons, to pro-
vide for the ascertainment and certification by a public
officer or board of qualifications to practice, and for the
public registry of legally licensed physicians, and to pro-
hibit and punish the practice of medicine by those who
have failed or refused to obtain the prescribed license or
certificate of qualifications. This statute provides for the
appointment of a "board of seven medical examiners from
various recognized schools of medicine," who shall qualify by
taking an oath that they are "graduates of legally char-
tered colleges in good standing, and that they will faith-
fully perform the duties of their office." Section 1. Sec-
tion 2 provides that said board shall have the power to
issue certificates to all who furnish satisfactory proof of
having received degrees or licenses from chartered medical
colleges in good and legal standing, and pass a satisfactory
examination before said board; that said board "shall pre-
pare two forms of certificates, one for persons examined and
favorably passed upon by the board, the other for persons as
provided for in section 11 of this act." Section 3 pro-
vides that the fee for the examination and certificate, as
provided for in section 2, shall be $25, which shall be
paid to the treasurer of the board of examiners. Section
4 provides that, "graduates of respectable medical colleges
who are at this time engaged in actual practice in this
territory shall be licensed to practice medicine under this
act upon presentation of their degree to said board and
upon producing satisfactory evidence of the identity of
said applicant. The fee for such license shall be five dol-
lars, to be paid to the treasurer of the board of examiners."
Section 8 provides that "the board of medical examiners
may refuse to issue the certificates provided for in this act to

individuals guilty of unprofessional or dishonorable conduct, the nature of which shall be stated in writing, and it may revoke such certificates for like causes, to be stated in writing." Section 10 provides that "any person practicing medicine or surgery within the territory without first having obtained a certificate as herein provided for, or contrary to the provisions of this act, shall be deemed guilty of a misdemeanor." Section 11 provides that "all persons not graduates of medical colleges who have practiced medicine ten years continually in this territory, prior to the taking effect of this act, shall, upon proper application and payment of the fee for examination as provided in section 3 of this act accompanied by a petition signed by twenty-five legal voters living in the city or precinct where such applicant practices, be admitted to examination before the board of medical examiners, and if satisfactory shall receive such certificate, unless it shall be ascertained and determined by the board of medical examiners that the person so applying for a certificate is of immoral character or guilty of unprofessional or dishonorable conduct, in which case said board may reject such application, and provided that such application for a certificate shall be made within six months after the taking effect of this act; and all persons holding a certificate on account of ten years' practice shall be subject to all the requirements and discipline of this act in regard to their future conduct in the practice of medicine, the same as all other persons holding certificates. And all persons not having applied for or received such certificates within six months after the taking effect of this act, and all persons whose applications have for cause herein named been rejected or certificates revoked, shall, if they practice medicine, be deemed guilty of practicing in violation of law, and shall suffer the penalties herein provided." And in section 15 it is provided that "the term respectable medical colleges in this act shall include

colleges in legal standing of any recognized school of medicine." The other sections of the act relate to the public registry of physicians' licenses, meetings of the board, and other matters not necessary to be recited.

That legislation of the general character enacted in this statute—namely, legislation to protect the community against the effects of ignorance and incapacity, as well as deception and fraud, in the practice of medicine, by requiring a certain degree of learning and skill upon the part of the practitioner, "ascertained upon an examination by competent persons, or inferred from a certificate in the form of a diploma or license from an institution established for instruction on the subject"—is a legitimate exercise of the police power of the state, and that depriving persons not so qualified of the right to practice is not obnoxious to the inhibition of the federal constitution against the deprivation of property without due process of law, are propositions which are thoroughly settled. *Dent* v. *West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231; Tied. Lim. §§ 87, 88; Cooley, Torts, p. 289. This general proposition is admitted by the appellant, but he attacks the statute as violative of the constitutional provisions that the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states, in that graduates of respectable medical colleges who were at the time of the passage of the act engaged in actual practice of medicine in the territory may be licensed, under section 4 of this act, without examination, and upon the payment of a fee of only $5; while citizens of a state or other territory who were likewise graduates of respectable medical colleges, but who were not engaged in actual practice in this territory at the time of the passage of the act, are not entitled to such privilege, but, in addition to presenting their diplomas and making proof of their identity, must also submit to

an examination as to their qualifications to practice, and must pay a fee of $25. This statute does not contravene this provision of the constitution; nor does it contravene that part of the fourteenth amendment which declares that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;" nor is the statute obnoxious to either of these constitutional provisions by reason of the fact that persons who have practiced medicine for 10 years continually in this territory prior to the taking effect of the act may be licensed to practice upon passing a satisfactory examination, although without a diploma, while others are required both to pass an examination and to possess a diploma. The plain answer to the appellant's objection is that these provisions of the statute are not directed against the citizens of other states. They do not abridge any of their privileges or immunities. They do not withhold from them any privileges or immunities which are not withheld also from citizens of Utah similarly situated. "Citizens of other states are entitled to practice medicine and surgery here on precisely the same terms and subject only to the same restrictions as our own citizens." Even if it were true that one of the sorts of qualifications is such that none but the citizens of Utah could possess it, this would not render the act obnoxious to this provision of the constitution. *Ex parte Spinney,* 10 Nev. 333; *Harding* v. *People,* 10 Colo. 387, 15 Pac. 727.

It is contended by the appellant that the statute is unconstitutional, because, as he claims, no disposition is directed of the fees authorized by sections 3, 4, and 11 of the act. The act creates a treasury and a treasurer of the board. It provides fees shall be paid to the treasurer; that is, into the treasury of the board. The board is a board of public officers, created for a public purpose, charged with the performance of important public duties,

in the exercise of which various expenditures must neces-
sarily be made. That the board shall have power to incur
and pay expenses is not only implied from its very neces-
sity, but distinctly appears from the provision of section
12 that the fees received from applicants to practice ob-
stetrics shall be applied towards defraying the expenses of
said board. It is argued by the appellant that the latter
provision defines the limit to which expenses may be paid
out of the fees received; that the act appropriates only the
fees received from applicants for license to practice obstet-
rics to the payment of the board's expenses; and that all
other fees are exacted for no definite purpose, and are
therefore illegal. But there is nothing in the act to show
that the legislature contemplated that the fees mentioned
in section 12 would be sufficient to defray all the expenses
of the board, nor does the mere absence from the other
sections of a provision similar to that contained in sec-
tion 12 afford any ground for arguing that the other
classes of fees were not intended to be devoted to the
same purpose. The language of section 12, on the con-
trary, seems to clearly imply that the legislature contem-
plated the fees mentioned in that section as only one of
the sources from which the expenses of the board should
be paid. The phrase "to be applied toward" defraying,
etc., is the language appropriate to a case in which it is
contemplated that a particular source of revenue will be
sufficient to pay only a part of the required outlay. It is
unnecessary to determine whether the compensation of the
members of the board for their official services may not be
one of the expenses which the board is authorized to pay
out of its treasury. It is sufficient to say that the act,
by necessitating expense in its execution, in creating a
board treasury, and providing an income, clearly implies a
power to devote that income to the payment of necessary
expenses. The fees provided for are all manifestly intended

to meet the cost of executing the law, and are therefore legitimate and proper license fees, whether the actual cost of executing the law has been overestimated or underestimated or correctly estimated in fixing the amount of fees.

The objection that the statute attempts to confer judicial power on the board is not well founded. Many executive officers, even those who are spoken of as purely ministerial officers, act judiciously in the determination of facts in the performance of their official duties; and in so doing they do not exercise "judicial power," as that phrase is commonly used, and as it is used in the organic act, in conferring judicial power upon specified courts.. The powers conferred on the board of medical examiners are no wise different in character in this respect from those exercised by the examiners of candidates to teach in our public schools, or by tax assessors or boards of equalization in determining, for purposes of taxation, the value of property. The ascertainment and determination of qualifications to practice medicine by a board of competent experts, appointed for that purpose, is not the exercise of a power which appropriately belongs to the judicial department of the government. It does not trench upon the judicial power. *Williams* v. *State,* 113 Ind. 514, 16 N. E. 192; *State* v. *State Board of Medical Examiners,* 34 Minn. 387, 26 N. W. 123. This act entitles every person whose qualifications to practice medicine, in point of learning and skill, or in point of moral character, is in any manner drawn in question, to a hearing before the board. It would be absurd to contend that the courts must be converted into boards of medical examiners to ascertain and decide whether an individual posesses such technical knowledge or such moral character that he may be permitted to practice medicine with safety to the public, or whether

20

the institution from which he holds a diploma is a "respectable medical college," or, on the other hand, a fraud or an institution whose instruction is unfit to properly and decently prepare its graduates for practice. The determination of these and kindred questions relating to the fitness of an individual to carry on an occupation requiring for its safe and proper conduct a person of decent moral character, or to engage in an occupation requiring special knowledge, care and prudence, such as that of a pilot or many others which may be mentioned, including, of course, the practice of the professions of law and medicine, may constitutionally be and is very properly devolved everywhere upon boards of inspection composed of experts in the particular occupation in question. The right of every person whose qualifications, mental or moral, are to be determined by this board, to a hearing before it, is clearly implied by the provisions for the administration of oaths and the taking of testimony "in all matters relating to its duties," and from other provisions of the act. If the board should, through malice or prejudice or dishonesty, arbitrarily refuse or revoke a license, the injured party would have his remedy by appropriate proceedings in the courts, and the board would be restrained from doing or compelled to undo the wrong. But, if the action of the board is in good faith, its final determination of qualification is not obnoxious to any constitutional provision. Due process of law is not necessarily judicial process. *Ex parte Wall,* 107 U. S. 265, 2 Sup. Ct. 569; *State* v. *State Board of Medical Examiners,* 34 Minn. 389, 26 N. W. 125; *Railroad Co.* v. *Backus* (Ind. Sup.), 33 N. E. 421. A uniform rule and a uniform process for ascertaining and determining qualifications as prescribed by this act, operating equally on all persons, affording to all persons the right to establish their qualifications before the board, this is due process of law.

The validity of the appointment of the board acting at the time specified in the complaint is challenged upon the ground that none of the members were appointed · by and with the advice and consent of the council, as provided in section 1 of the act.    It may be noted, in the first place, that not only was the act approved on the last day of the session of the legislature which enacted it, but, there being no specified time mentioned in the act upon which it should go into effect, it would take effect, under the provisions of section 2973 of the Compiled Laws, upon June 1, 1892.    It was therefore legally impossible for the governor to appoint a board of medical examiners by and with the advice and consent of the upper house of the legislature which passed the act.    The provision that the governor shall appoint the board upon the passage of this act is to be construed as equivalent to a provision that he should appoint upon the taking effect of the act.    *Harding* v. *People*, 10 Colo. 387, 15 Pac. 727.

To assume that the legislature intended to create offices which could not be filled until the next biennial session, to make a law which could not be executed for two years, although legally in effect on the 1st day of June next following its enactment, would be an absurdity.    But the power of the appointing executive, under such a provision as that contained in this act and in section 7 of the organic' act, to fill a vacancy, when such vacancy occurs during the recess of the confirming legislature or legislative body, has been frequently recognized as a necessary incident of the executive power.    Such an appointment by the governor of this territory, without the advice or consent of the council to an office validly created by the legislature, but which had never been legally filled, was recognized by the supreme court of the United States in the case of *Clayton* v. *Utah Territory,* 132 U. S. 632, 10 Sup. Ct. 190.    The· validity of the appointment made by

the governor alone during the recess of the legislature has received the further sanction of long-continued practical recognition in all the departments of the territorial government. The offices created by this act came into existence June 1, 1892, and were vacant; and, although they had not become vacant by the death or resignation of any incumbent, it was clearly the duty of the executive to fill them, and put the law into execution. The provision in the statute for the filling of vacancies by the governor was in itself a sufficient warrant for his action, although his power to do so might well be rested on other grounds. His failure to make the appointments within a month after the offices came into existence did not invalidate them, that provision being clearly directory. The board was validly appointed.

For the reasons stated in this opinion, the judgment of the court below is affirmed.

BARTCH and KING, JJ., concur.